IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Donald E. Budd, Jr., *et al.*,
    Plaintiffs,

vs.                                                    Case No. 12-2431-JTM

Unified Government of Wyandotte
County/Kansas City, Kansas, *et al.*,
    Defendants.

MEMORANDUM AND ORDER

Suspecting that a standing mower advertised on Craigslist was property stolen from a Missouri resident, several members of the Kansas City, Missouri Police Department (KCMoPD) conducted a sting operation in which they traveled to Kansas, posing as prospective buyers.[1] As a result of their operation, plaintiff Donald E. Budd, Jr., was detained, and the mower was taken into custody by officers of the Kansas City, Kansas Police Department (KCKPD), operating on behalf of the Unified Government of Kansas City, Kansas and Wyandotte County.[2] Budd has brought the present civil rights action against officers of both departments, as well as the Unified Government.

All of the defendants have moved for summary judgment. For the reasons provided herein, the court hereby grants the motion filed by the Unified Government and the KCKPD officers. The motion by the KCMoPD officers is granted in part and denied in part.

---

[1] The Missouri defendants are Robert Deyaeghere, Rodney Gentry, Thomas Butkovich, Mark Porter, Mark Johnson, and Michael Moore.

[2] In addition to the Unified Government of Wyandotte County/Kansas City, Kansas, the Complaint names as defendants KCKPD clerk Ashley Sanders and Major John Cosgrove.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

*Findings of Fact*

2

On May 6, 2011, Michael Green reported to Kansas City, Missouri police officer Bobbie Irvin that his Wright Stander mower had been stolen from a Wal-Mart parking lot. Green gave Irvin the mower's serial number (29751), and Irving prepared an offense report.[3]

On May 27, 2011, Central Pawn, a licensed Kansas pawnbroker, bought a Wright Stander mower for $1300, from a man identified in the bill of sale as "JR Rodriguez." Don Budd, Jr., the corporate officer of Central Pawn, took the mower to his residential property, and placed the mower in a storage shed.

Shortly thereafter, Central Pawn listed the mower as available for purchase in Craigslist for $4500. The ad does not mention Central Pawn, and gives only Budd's cell phone number.

Green saw the listing, and telephoned KCMoPD Sgt. Ropka. Green told Ropka that he believed the mower was his, and that he could identify it by a unique bracket he had attached. Ropka called the number listed on the Craigslist ad, posing as an interested buyer, and made arrangements to inspect the mower within the next hour or two. Budd gave Ropka an address, which contains both Budd's home and the storage building which held the mower.

Ropka then briefed Sgt. Gentry about the ad, the mower's location, as well as identifying marks on the mower. Gentry had Officer Porter contact Green to discuss the identifying characteristics of the mower. Ropka and Gentry were unaware that the serial number for the mower was included in Irvin's report, so Porter prepared a list of the mower's unique characteristics. These included the custom bracket installed by Green, a partial tear on the left side of the standing pad, a new built pulley on the right side of the

---

[3] In response to the motion for summary judgment, Budd stresses that other Missouri police officers were later unaware of the serial number's existence in Irvin's report. However, nothing contradicts Irvin's unequivocal testimony that Green gave him the mower's serial number, and he placed in it his report.

3

mowing deck, and another custom, tie-down bracket installed by Green on the mowing deck.

Gentry formed a squad of KCMoPD officers, who drove to Budd's location. Gentry, Porter, and Butkovich drove in a Chevy Tahoe. Other officers drove in a blue Ford Crown Victoria, which held back in reserve.

At around 2:20 p.m., the officers in the Tahoe arrived at the place where Budd kept the mower. Gentry and Porter got out of the Tahoe and approached Budd, and told him they worked for a lawn servicing company and were interested in buying the mower.

Budd went into his storage building and pushed the mower out onto a concrete slab in front of the building. According to Budd, he became concerned because Gentry and Porter appeared evasive, and he could tell neither Gentry nor Porter knew how to start the mower or operate it. In addition, he saw a third person in the Tahoe, and became concerned he was about to be robbed.

In addition, Budd states that one of the Missouri officers entered the storage shed and began to look around. Budd asked him to get out, but the officer did not leave. Instead, another officer went into the building. Budd did not do anything threatening, and appeared polite and reasonable.

Porter looked at the mower and found noted four modifications by Green that were unique to his mower. The officers then called in a Kansas City, Kansas police officer stationed nearby. It is unclear how this occurred. There is some evidence that Gentry or Porter signaled to Butkovich that the mower was the one they were looking for, and Butkovich then made the radio call. Other evidence suggests that Gentry made the call.

Budd took about three steps toward his vehicle, which was then about twenty yards away, but stopped when Gentry and Porter pulled out their badges, identified themselves as KCMoPD officers. According to Budd, one of them also pulled out a weapon. (The officers deny any weapon was drawn.) The officers told Budd he was under arrest. At the

time the gun was drawn, Butkovich was leaving or had just left the Tahoe, about 10 to 30 yards away.

Budd claims that he first believed the officers were imposters, since they were Missouri police officers in Kansas. He states that he felt "panicked" and was afraid "he could be shot or stabbed."

At some point, according to Budd, the Missouri officers told him that they had a videotape of him stealing the mower.

At approximately the same time, Officer Cheryl Purintin arrived in a Kansas City Kansas Police Department car, as well as additional KCMoPD officers in the Crown Victoria. Officer Deyaeghere got out of the Crown Victoria and met with the other Missouri officers.

At the request of Gentry and on his information, Purintin handcuffed Budd. She later removed the handcuffs and had Budd sit in the back of her vehicle.

The mower held by Central Pawn had the same serial number, 29751, as that on the mower stolen from Green. At some point, The Missouri officers discovered the serial number for Green's mower, and found it matched the mower at Central Pawn. Ropka confirmed the mower's serial number with an officer in Kansas, although it is unclear who this officer was.

Kansas officers took custody of the mower, and Budd understood the mower was being taken to the department's property room. The evidence establishes that the Missouri officers (Moore, Johnson, Butkovich, Deyaeghere, Porter and Gentry) did not seize the mower or see any other KCMoPD officer seize it.

Budd does not allege that any of the Missouri defendants entered the storage shed other than Gentry, Porter, and Butkovich.

It is uncontroverted that defendants Moore, Johnson, Butkovich and Deyaeghere did not draw a weapon or use any physical force against Budd. Budd does allege that

5

Butkovich did identify himself by flashing his badge. Budd alleges that during this time the Missouri officers told him, falsely, that the had videotape of him stealing the mower.

Budd stresses that the Missouri officers conducted their sting operation without first checking out the number in the ad, and did not conduct an investigation of the address he gave to Ropka over the phone. They knew nothing about Central Pawn. When they conducted the sting operation, they did not have an arrest warrant or a search warrant. There was no hot pursuit, or any exigent circumstances requiring immediate or forceful action. At least one of the Missouri defendants has admitted that the alleged crime was not particularly serious. Budd never took any threatening action against the officers.

Policies for the KCKPD are set by the chief of police and embodied in general orders, and the Department's policy on found, safekeeping, and evidentiary property is set out in General Order No. 80.02. Under that Order, "[w]henever officers come into possession of any evidence or property, whether it be found or seized for safekeeping, they will immediately complete a Property Report explaining the facts under which they came into possession of such property."

Under Section III(G) of the General Order, "Officers will place all property in the property room or the after-hours property locker room before the end of their tour of duty." In addition, "[i]f property is recovered after hours, which is of such unusual size, volume, or value that it renders the usefulness of the storage room impractical, a designee from the Property/Logistics Unit will be contacted to assist with securing the property."

Section XV of General Order controls the disposition of evidence and property:

A. Evidence and property should be disposed of in accordance with state statute KSA 22-2512 and/or other applicable laws.

   1. Safekeeping and found property should be disposed of within six (6) months after the legal requirements pertaining to these items have been satisfied.

   2. Items may be disposed of by return to legal owner, public auction, destruction, or conversion to Departmental use.

6

3. The Logistics Unit will make a reasonable effort to identify and notify the owner of releasable property in their possession, within all applicable legal parameters, prior to disposing of it in any other manner.

. . .

C. Evidence and property may be disposed of following:

1. Expiration of statute of limitation for prosecution.

2. Court order.

3. Upon confirmation with the District Attorney's office that the property will no longer be needed as evidence.

4. Authorization has been given by way of an Evidence Reclassification Form.

a. An Evidence Reclassification Form (#341) will be completed by the case detective when it is learned through the course of the investigation that the property initially seized as evidence is no longer of any evidentiary value in any criminal proceedings. The evidence can then be reclassified to the status of safekeeping.

b. Evidence reclassification must be approved by a Commander in the Criminal Investigation Bureau.

. . .

E. Release of evidence and property will be as follows:

1. Items may be returned to their legal owner after authorization, and upon presentation of proof of ownership and proper identification.

Officer Myers prepared a property report and prepared to take the mower for storage. However, when the mower proved to be too large for the police property truck, Myers called a tow truck. He later completed a tow report, which was approved by his supervisor, Master Sergeant Moore. Myers impounded the mower pursuant to Unified Government Code Section 35-196, which provides that, in specified circumstances, a police officer may remove or cause to be removed any vehicle "found upon a highway," and had the mower towed to a tow lot.

Captain Bill Howard, who commanded the KCKPD's property crimes unit testified that the mower was a piece of equipment or machinery, not a vehicle subject to being

towed under Section 35-196. The mower was not a mode of transportation and did not have a VIN number. Major John Cosgrove, commander of the Bureau of Investigations and Captain Howard's supervisor, also testified that the mower was not a vehicle subject to being towed under Section 35-196.

Although the KCKPD will sometimes tow large items, the mower was not a vehicle within the meaning of 35-196, and so should have been taken to the property room, or an off-site location managed by the property room, and held as evidence.

The plaintiff stresses that, as a matter of practice, the KCKPD would frequently use a tow truck to remove large items, but this does not address *where* items were to be taken, or controvert the clear policy under which all non-vehicular evidence should be taken to the property department.

Section 35-196 does not authorize the towing of a vehicle from private property. KCKPD General Order No. 40.8, Towing Procedures, section VII(B) provides: "The provisions of Unified Government Ordinance 35-151 [recodified as 35-196] do not provide for the towing of vehicles from private property except as described in section VII.A." And section VII(A) states that "[i]f there is probable cause to believe a vehicle located on private property has been used in the commission of a crime, and the vehicle is needed for evidence in connection with said crime, the officer is then authorized to tow the vehicle if there is also appropriate legal justification for entry upon the property without a warrant, and upon approval of a Field Supervisor."

General Order No. 40.8(V) authorizes officers to place a hold on a vehicle being towed in certain circumstances, including when "[t]he vehicle has been used in the commission of a crime and the vehicle must be processed for evidence, or the vehicle itself is evidence" or for "[p]roof of ownership." It is uncontroverted that, at the time it was seized, the mower was on private property.

In the tow report, Officer Myers failed to place an evidentiary hold on the mower.

He also erred in failing to place a hold for proof of ownership on the mower, or indicate that the mower had been in the possession of Central Pawn, that Central Pawn had bought the mower, or that Central Pawn claimed an interest in it. He then turned the property report in, even though the mower had not been taken to the property room.

On May 31, 2011, Major Cosgrove talked with Budd about the disposition of the mower. It is uncontroverted that at the time, Cosgrove was unaware that the mower had been towed to a tow lot, rather than the property room. Cosgrove told Budd that the mower was in the property room, and that a hearing would be held before the mower was released.

On June 1, 2011, Defendant Ashley Sanders, a clerk with the Kansas City, Kansas Police Department's Auto Release Unit, released the mower to Green. Sanders was unaware of the circumstances surrounding the seizure of the mower and did not know that Central Pawn claimed an interest in it. As an auto release clerk, Sanders dealt only with items taken to the tow lot, not with items in the property room.

When releasing a vehicle, Sanders relies on the tow report, and does not look at other police reports unless directed by her superior. Unless the tow report indicates that a vehicle is to be held as evidence, the tow lot releases the vehicle to a person who presents proper registration, insurance, and identification. Otherwise, the person claiming the vehicle can obtain a release at the Police Department. In the case of a non-titled item, such as a trailer or mower, Sanders asks the claimant for proof of ownership. She would then present or describe the information to a supervisor, who decided whether the item could be released.

Sanders does not recall releasing the mower to Green, or which supervisor she consulted. She may have spoken with Cosgrove or Howard, or another acting superior officer. The release form for the mower does not contain a stamp or signature authorization by either Cosgrove or Howard.

KCKPD Detective Mark Bundy began his duties as pawnshop detective on June 1, 2011. That same day, Bundy spoke with Plaintiff Budd's son, Don Budd III, about the mower. Detective Bundy picked up a copy of the bill of sale from Plaintiff Budd or his son.

Bundy had hard copies of the property report prepared by Officer Myers, which indicated that the mower was being held as evidence, but did not have the tow report or Auto Release. He also relied on Officer Purinton's report, which indicated that the mower was taken to the property room. As a result, Bundy believed that the mower was being held as evidence in the property room and was unaware that the mower had been towed or that it had been released to Green on June 1.

Bundy spoke with Budd several times in June. Budd asked when the mower would be released and indicated he wanted a hearing. Bundy told Budd that the mower was still being held and had not been released, which was his understanding.

According to Budd, he spoke with Cosgrove ten times during the month of June about the mower. He separately spoke with Detective Bundy.

Between June 1 and June 28, 2011, Bundy attempted unsuccessfully to contact Sergeant Gentry of the Kansas City, Missouri Police Department to discuss the status of that department's investigation and whether the mower still needed to be held as evidence.

Myers' tow report lists Green as the "vehicle owner," indicates the mower was stolen, and gives Green's address and contact information. His property report indicates that Budd had purchased the mower, listing his street address.

On or about June 28, 2011, Major Cosgrove asked Bundy for a report on the status of the mower. Bundy emailed Cosgrove:

> I have been called by Mr. Budd several times as he is wanting to know the status on the mower and recover it if it is not found to be stolen. I have called Sgt. Gentry several times and left messages over the past couple of weeks (since June 2nd). I have spoke with [Kansas City, Missouri] detectives in the South Patrol Property Unit as well who were not familiar with the case. Mr. Budd is continuing to call about the mower and we have now had it in property for nearly a month. I do not have a case number for KCMO, but I have the following information on the mower: Wright 42" Mower (Serial#

10

WS4217KAWRE) [sic]. I need to know what KCMO is wanting us to do with this so I can advise.

Bundy then spoke with Sergeant Gentry, and discovered that the mower had been released to Green.

At some point, Bundy called Myers, who told him that the mower had been taken to the tow lot rather than the property room. Myers is uncertain as to when this occurred. According to Myers, he told Bundy that the mower was not in the property room.

After talking with Sergeant Gentry, Bundy located the tow report in the KCKPD database, and discovered that the mower had been towed and was not in the property room as he had thought. He learned from the Auto Release form that the mower had been released to Green on June 1, 2011.

Bundy notified Cosgrove about the release, and Cosgrove had Bundy tell Budd. At Cosgrove's direction, Bundy informed Budd that the mower had been released. Before Bundy told him otherwise, Cosgrove was unaware the mower had been released. Similarly, Howard also believed that the mower was in the property room.

Everyone Budd contacted at the KCKPD indicated that the mower was in the property room, until he was later informed that the mower had been released on June 1, 2011.

If an item is seized by the KCKPD and the ownership of that item is disputed, a hearing is held to determine whom the seized property belongs to.

It is uncontroverted that, as the commander of the property crimes unit, Captain Howard did not have authority to make policy for the Police Department, but was required to follow the general orders promulgated by the chief of police. Similarly, as a district sergeant whose job was to supervise patrol officers, Sergeant Moore did not have policy-making authority for the Police Department.

The present action is the only legal action that Central Pawn has brought over the mower.

*Conclusions of Law*

Budd has advanced three claims against the Missouri officers. As set forth in the Pretrial Order, Budd alleges that the defendants violated 42 U.S.C. § 1983, infringing his constitutional rights by false detention. Second, he presents a common law claims for false imprisonment and assault. (Dkt. 113, Pretrial Order, at 23-24). In addition, he has advanced a claim for unlawful deprivation of property against the Kansas defendants, based upon the release of the mower.

Although the Pretrial Order indicates only that the § 1983 claim alleges unlawful detention, Count 1 of Budd's Amended Complaint is broader, and alleges violation of Budd's rights through "illegal confinement, unlawful and illegal searches, unlawful taking of property, physical abuse, unreasonable use of force, coercion, and intimidation." (Dkt. 59, at 9). In their briefing on the summary judgment motions, the parties understand Budd's § 1983 claims to encompass excessive force and unlawful force as well as false arrest. (Dkt. 122, at 13-19; Dkt. 134, at 22-36). In addition, while Budd's § 1983 claims are explicitly asserted under the Fourth and Fourteenth Amendments, Budd does not challenge the Missouri defendant's contention that his claims are governed by Fourth Amendment standards. *See County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).

The Missouri defendants argue (Dkt. 122, at 12-14) they are protected by the doctrine of qualified immunity, under which state officers acting in the performance of their duties are not subject to liability unless the violate clearly-established constitutional rights. *See Harlow v. Fitzgerald*, 457 U.S. 818 (1982); *Saucier v. Katz*, 533 U.S. 194 (2001); *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). In particular, the defendants contend that the evidence fails to show that they unlawfully confined Budd, subjected him to any excessive force, or illegally searched his property.

They contend that only Gentry and Porter were actually involved in interacting with

Budd, and that none of the other officers were involved in the arrest, and that Porter and Gentry had probable cause to arrest Budd for receiving stolen property. (Dkt. 122, at 15). They further argue that only one of the officers (either Gentry or Porter) drew a firearm, and that this cannot constitute excessive force under the circumstances. And they argue that there was no unreasonable search by the officers entering the storage shed.

As to the claim of unlawful detention, the court denies the motion for summary judgment as to Gentry, Porter, Deyaeghere, and Butkovich. As noted earlier, the defendants argue that they had probable cause to arrest Budd for possession of stolen property, or at least are protected by qualified immunity for that arrest.

Notably, however, the defendants do not discuss the elements of the crime of possession of stolen property in Kansas, or even mention the relevant statute, K.S.A. 21-5801(a)(4). That statute explicitly defines, as one form of "theft" under Kansas law, "obtaining control over stolen property or services *knowing the property or services to have been stolen by another*." (Emphasis added). Moreover, "theft under *any* theory [of the statute] requires a specific intent to deprive the owner permanently of possession of the item taken." *State v. Williams*, No. 107,009, 2013 WL 1149678, *10 (Kan.App. March 15, 2013).

All of the evidence cited by the defendants simply establishes probable cause for them to conclude that the mower belonged to Green. There was nothing to directly suggest that Budd knew the mower had been stolen. Of course, inferences of such knowledge may be inferred from the manner, timing, or price demanded by a seller of stolen property,[4] but there is no evidence here that any of these elements were suspicious. While the Craigslist

---

[4] There is some very early authority which recognizes that if stolen property is detected shortly after the crime, a permissible inference arises that the possessor was involved in the theft. *See State v. Conway*, 56 Kan. 682, 44 P. 627, 628 (1896) (trial court instruction should have stated that "the possession of stolen property recently after the theft is prima facie evidence of guilt of larceny"). But *Conway* speaks in terms of property recovered "early the next morning." *Id.* Here, the mower was recovered several weeks after the theft, and as defendant Gentry admitted, "[w]hether it's cars or lawn mowers, a lot of times it has a tendency to switch hands, sometimes a multitude of times."

13

ad does not directly identify Central Pawn as the prospective seller, it does explicitly include Budd's cell-phone number, which, the evidence shows, can be easily traced to him and Central Pawn. Further, the advertisement was openly published, and Budd effectively invited the defendants to view the mower at his residence. The court concludes that the plaintiff has presented a valid claim of unlawful detention as to defendants Gentry, Porter, and Butkovich.

The evidence suggests that these officers played some role in formally or physically detaining the plaintiff. However, the court will grant summary judgment as to the remaining Missouri defendants. Budd makes no contention in his Response that Johnson or Moore was involved in the arrest. He does argue, however, that Deyaeghere is responsible for failing to intervene and stop the arrest.

The only cases cited by Budd as indicating a duty to intervene involve claims of excessive force. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (recognizing that "personal involvement" under § 1983 may be established either by supervisor liability or if the defendant "fails to intervene to prevent a fellow officer's excessive use of force"); *Stewart v. City of Prairie Village, Kan.*, 904 F. Supp. 2d 1143, 1158 (D. Kan. 2012) (personal involvement may exist "[i]f an officer fails to intervene and observes or has reason to know that the other officer is using excessive force").

Some courts have directly held that personal involvement may arise by failing to intervene in an unlawful detention. *See Gagnon v. Ball*, 696 F.2d 17, 21 (2d Cir.1982). In *Gagnon* the court held the second officer responsible without substantial discussion, and where the facts indicated that the second officer may have actively aided in the arrest. Subsequent decisions have not understood *Gagnon* to render all officers in the vicinity of an arrest as subject to § 1983 actions. *See Hernandez v. City of Napa*, 2010 WL 4010030, *15 (N.D. Cal. 2010); *Swagler v. Sheridan*, 2011 WL 2635937, *6 (D. Md. 2011).

Here, there is no evidence that Deyaeghere physically restrained or detained Budd.

14

There is no evidence that he did anything other than briefly stand with the other three officers while one of them, Budd does not aver it was Deyaeghere, told him the story about the videotape. By that time, Budd was already in custody. The court finds that the plaintiff has failed to show that Deyaeghere personally participated in the arrest, or that his actions in simply standing by while a superior officer effected an arrest, violated any clearly-established constitutional norm.

The defendants also seek summary judgment as to Budd's claim of an unconstitutional search. Budd argues that two of the three officers from the Tahoe entered the storage shed without his permission, and in fact ignored his request that they leave it. They argue that this claim is flawed because Budd "cannot say whether the officer heard him." (Dkt. 122, at 17). Second, while Butkovich may have "wander[ed] inside an open storage unit," he did not "conduct a search." (*Id*. at 18). To the extent that Gentry or Porter entered the shed, they did not "search[] the unit in a comprehensive manner," and in any event this "occurred in connection with their undercover role." (*Id*.)

The defendants cite no authority whatsoever for their argument in general, and none for the propositions that a police officer's entry into a building is not subject to Fourth Amendment scrutiny, or that such nonconsensual entry is justified in order to stay in character. The Supreme Court has recognized that undercover officers may enter a residence when they are invited to do so. *See Lewis v. United States*, 385 U.S. 206 210 (1966) ("petitioner invited the undercover agent to his home for the specific purpose of executing a felonious sale of narcotics [and his] only concern was whether the agent was a willing purchaser who could pay the agreed price"). Here, however, the entire point of the plaintiff's claim is that not only did not invite the entry into the storage unit, but tried to stop it. The defendant's contention the officers may not have heard Budd is simple speculation. At the present stage, the court grants all reasonable inferences to the plaintiff, and assumes that Budd spoke at a volume sufficient to be heard by the persons at the

15

scene.

The court denies the motion for summary judgment as to the claim of excessive force against defendants Gentry and Porter. The defendants argue that the action was justified because Budd "abruptly ... moved suddenly toward his car," (Dkt. 122, at 16). Budd stopped moving after the gun was drawn, but there is no indication that the officers could not have obtained the same result by simply identifying themselves.

At the time Budd moved towards his car, the officers had yet to identify themselves as police. Moreover, the defendants point to no fact justifying the use of force except for Budd's retreat. The evidence establishes that some of the defendants themselves did not believe the underlying crime was particularly serious. Budd never appeared threatening, and there was no reason for the defendants to believe he was armed. There is no evidence that the defendants believed Budd had any prior history of violence. The evidence is unclear at this point as to how the gun was drawn or where it was pointed.

The court will grant summary judgment as to the Missouri defendants other than Gentry and Porter. There is no evidence that any of these other defendants employed any force against the plaintiff. Budd's general argument that all the Missouri defendants are collectively responsible for the actions of the sting team fails to recognize the actual use of force, the drawing of the weapon is set forth only with respect to the claim of unconstitutional arrest. (Dkt. 134, at 26-27), not the claim of excessive force. Budd alleges that Porter or Gentry, pulled their weapon, not Butkovich or any of the other officers. (Dkt. 134, at 8).

Further, the only actual use of force in the case, the drawing of the firearm, was extremely brief.[5] By the time any of these officers might have attempted to intervene, the

---

[5] Budd also complains that he was "surrounded" by the officers, and that they flashed their badges at him. (Dkt. 134 at 26, no. 3). But all of Budd's complaints about being "surrounded" take place only in the argument section of his Response. The underlying facts (¶¶ 50, 56-59) fail to make this allegation. Budd supplies no authority or argument to explain why flashing a badge, while relevant to the claim of false arrest,

16

damage had already been done. Even under the failure to intervene theory, "'there must have been a realistic opportunity to intervene to prevent the harm from occurring.'" *See Vondrak v. City of Las Cruces*, 535 F.3d 1195, 1210 (10th Cir. 2008) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

Here, again, the actions by Porter and Gentry in identifying themselves as police officers were essentially simultaneous with the drawing of the gun by one of them. There is no evidence that the display of the firearm took more than a few seconds. Nor is there any evidence that any of the other defendants could have reasonably done anything to stop the officer who pulled his weapon short of drawing their own, which would hardly have reduced the threat of violence at the scene.

The court will grant the summary judgment motion of the KCKPD officers. Those defendants argue that towing officer clerk Ashley Sanders is protected by qualified immunity, because she inadvertently released the mower. They argue defendant Cosgrove is protected by qualified immunity, and that the Unified Government is not subject to liability because Budd has failed to point to any policies or procedures on its part which caused the alleged deprivation. The court agrees.

First, the plaintiff fails to effectively respond to Ashley Sanders' claim of qualified immunity. The evidence indicates at most negligence on the part of the KCKPD in the release of the mower, without conducting a separate hearing. This situation arose when an officer on the scene, contrary to express KCKPD policy, had the mower towed to the vehicle impound lot rather that the property division.

The plaintiff correctly notes that there was additional documentation in the KCKPD computer system which could have revealed that the mower was subject to his claim of ownership, and individual officers may have erred in simply relying on the hard copy

---

would also constitute an act of force or violence, which a reasonable person would consider threatening.

information in their possession. But the evidence does not establish that any particular officer acted with a deliberate indifference to Budd's rights. *See Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)

Further, as to Major Cosgrove, the evidence fails to establish that he directly took any action as to the mower. Although Budd speculates that Cosgrove was the officer who released the mower (since Howard states he did not do so), the evidence does not establish that only Cosgrove or Howard could authorize the release of impounded vehicles. Sanders herself has no memory of the incident, and other superior officers in the same building could in fact authorize a vehicle release.

In addition, there is no evidence that Cosgrove acted with deliberate indifference to Budd's rights. The evidence establishes that the mower was released to Green from the impound lot shortly after it arrived. At this time and for the weeks following, Cosgrove understood the mower was under the control of the property division, not the impound lot.

Finally, the court agrees that the evidence fails to establish that any policy or procedure of the Unified Government underlies the alleged constitutional deprivation. *See Board of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 689 (1978). Under the established policies of the Unified Government, the mower should have been towed to the property division, not sent to the vehicle tow lot. While the plaintiff stresses the determination of the officer on the scene that the mower seemed to him to be a "vehicle," there is no evidence that this officer has any policy-making authority, and the Ordinance 35-196 clearly establishes that the mower should have been under the control of the property division. Similarly, Cosgrove himself had no authority to contravene explicit department policy. While the plaintiff argues that it was a custom to physically tow large pieces of evidence, this fails to address their proper destination — the vehicle impound lot or the property division. The explicit

procedure for large pieces of equipment was that they should be towed to an off-site storage facility under the control of the property room.

Finally, because the mower was released inadvertently, through the actions of random and unauthorized conduct, the plaintiff's remedies are limited to state law post-deprivation remedies. *See Parratt v. Taylor*, 451 U.S. 527, 543–44 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). *See McCormick v. City of Lawrence*, 253 F.Supp.2d 1172, 1199 (D. Kan. 2003), *aff'd*, 99 Fed.Appx. 169 (10th Cir. 2004) (finding adequate Kansas post-deprivation remedies).

To summarize, the court hereby grants the summary judgment motion of the Kansas defendants in its entirety. The court grants in part and denies in part the motion of the Missouri defendants. The plaintiff's § 1983 claims against defendants Deyaeghere, Johnson, and Moore are dismissed *in toto*. In addition, the court grants summary judgment as to the § 1983 claim of excessive force as to defendant Butkovich. The court otherwise denies the motion as to Butkovich, Porter, and Gentry. The court finding that the evidence, read in the light most favorable to Budd, could establish both that the defendants violated Budd's constitutional rights.

Although the Missouri defendants also sought to dismiss the common law false imprisonment and assault claims, they did so only on the basis of the statute of limitations, an argument subsequently withdrawn in their Reply. Thus, these claims remain necessarily remain in the case, even as to the peripheral defendants Deyaeghere, Johnson and Moore.

IT IS SO ORDERED this 13th day of January, 2014, that the Motion for Summary Judgment of the Kansas Defendants (Dkt. 128) is granted; that of the Missouri Defendants (Dkt. 122) is granted in part and denied in part, as provided herein.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE
